NUMBER 13-05-00668-CR


COURT OF APPEALS


THIRTEENTH DISTRICT OF TEXAS


CORPUS CHRISTI - EDINBURG

 


AUDREY R. LINTON, Appellant,


v.


THE STATE OF TEXAS, Appellee.

 


On appeal from the County Court at Law No 4 

of Montgomery County, Texas.

 


OPINION


Before Chief Justice Valdez and Justices Benavides and Vela


Opinion by Chief Justice Valdez



 Appellant, Audrey Linton, appeals from her conviction for driving while intoxicated. 
See Tex. Pen. Code Ann. § 49.04 (Vernon 2006). She asserts, inter alia, that the trial court
erred in not making proper accommodations for her hearing impairment. (1) Specifically,
Linton contends that in failing to make proper accommodations, the trial court violated
section 38.31 of the Texas Code of Criminal Procedure and denied her the right to confront
and cross-examine witnesses, pursuant to both the United States and Texas Constitutions. 
U.S. Const. amends. VI and XIV; Tex. Const. art. I, § 10; Tex. Code. Crim. Proc. Ann. art.
38.31 (Vernon Supp. 2006). We reverse and remand. 

I. Background

 Linton was arrested on November 17, 2003 on suspicion of driving while intoxicated. 
The State filed its complaint against her on December 31. On July 22, 2004, the trial court
held a hearing on a motion to suppress filed by Audrey's then court-appointed counsel. (2) 
Linton testified at the hearing, by use of a single interpreter, that she never learned to read
or write the English language and, therefore, was unable to communicate with the arresting
officer. (3) The trial court denied the motion to suppress without inquiry into Linton's level of
comprehension. Trial began on May 23, 2005.

 On the morning of trial, Linton urged an amended motion to suppress. In support
of her motion, Linton filed a letter from her physician and school records indicating that she
reads at a fourth grade level. Linton also urged the trial court to hear expert testimony so
that her level of comprehension could be adequately evaluated. The motion was denied. 
 The extent of Linton's hearing impairment was first made apparent by court-appointed interpreter, Charles Trevino. On the record, Trevino stated that Linton "does not
appear to know American Sign Language." Defense counsel then questioned Linton's
ability to understand the proceedings against her and again urged the trial court to hear
expert testimony regarding Linton's level of comprehension. The court declined to do so.

 Just prior to the jury entering the courtroom, Trevino again expressed his concern
about Linton's limited language capacity. He clarified that he was not interpreting but was
instead "transliterating" the proceedings for Linton. (4) Trevino also stopped short of stating
that transliteration would ensure adequate understanding. Linton once again raised her
"linguistic incompetence." The court reasoned, however, that any burden of ensuring
adequate understanding should fall on defense counsel. The trial proceeded with a single
interpreter. 

 On the second day of trial, Linton made an oral motion for mistrial based on the
competency issue. The trial court agreed to conduct an informal inquiry into the issue of
competence during which it permitted two witnesses to be called outside the jury's
presence. 

 Pastor Arthur Craig testified that he had been signing for thirty years and had known
Linton for eleven or twelve years. He stated that Linton does not understand American
Sign Language or straight English coding. He testified that following the first day of the
proceedings, Linton mentioned to him that she was confused and was not understanding
the signs that were being used. 

 Defense counsel also elicited expert testimony from Jean Andrews, Ph.D. (5) Andrews
testified that Linton reads at a fourth grade level. She further stated that about twenty
percent of what had been communicated to Linton in the proceedings through the
appointed interpreter's transliteration was finger spelling above Linton's level of reading
comprehension. She concluded that, given her assessment of Linton and her observation
of the signing in the courtroom, the delivery of literal transliteration was insufficient for
effective communication with Linton. Andrews specifically stated that Linton had language
skills insufficient to enable her to understand and know what was going on in the
proceedings and insufficient to enable her to communicate effectively with counsel. She
determined that Linton would be able to comprehend the proceedings and consult with
counsel if the court would provide a deaf relay interpreter that would work alongside the
hearing interpreter. 

 Following Andrews's testimony, the court appointed an interpreter to sit at the
defense table, where she would be "allowed to break down anything to the level at which
[Linton] can understand." The court noted that "this will be done, not simultaneous to the
interpreting of the interpreters, but at the time that the court takes breaks." 

 Defense counsel's motion for mistrial was ultimately denied. The case proceeded
with the interpreters attempting only to transliterate for Linton and an additional interpreter
seated at the defense table in order to facilitate communication between counsel and
Linton during trial breaks. 

II. Proper Accommodation 

 In her third issue, Linton contends that the trial court erred in not making proper
accommodations for her hearing impairment and thus denied her the right to confront and
cross-examine witnesses, pursuant to both the United States and Texas Constitutions. 
See U.S. Const. amends. VI and XIV; Tex. Const. art. I, § 10.

1. Applicable Law

 Article 38.31 of the Texas Code of Criminal Procedure governs the appointment of
qualified interpreters for deaf defendants and witnesses in criminal proceedings. See Tex.
Code. Crim. Proc. Ann. art. 38.31 (Vernon Supp. 2006). It provides: 

 If the court is notified by a party that the defendant is deaf and will be present
at an arraignment, hearing, examining trial, or trial, or that a witness is deaf
and will be called at a hearing, examining trial, or trial, the court shall appoint
a qualified interpreter to interpret the proceedings in any language that the
deaf person can understand, including but not limited to sign language. 


Id. 


 Article 38.31 implements the constitutional right to confrontation, which includes the
right to have trial proceedings presented in a way that the accused can understand. 
Salazar v. State, 93 S.W.3d 339, 340 (Tex. App.-Texarkana 2002, pet. ref'd, untimely
filed). The Texas Constitution requires that a defendant sufficiently understand the
proceedings against him to be able to assist in his own defense. See Tex. Const. art. I,
§ 10. Ensuring that the defendant has that minimum understanding is primarily the task
of the trial judge. Salazar, 93 S.W.3d at 341 n.1 (citing Lincoln v. State, 999 S.W.2d 806,
806 (Tex. App.-Austin 1999, no pet.). If a hearing impaired defendant is unable to
understand sign language, the court has an obligation to fashion a remedy suitable to
overcome the defendant's disability. Lincoln, 999 S.W.2d at 809; Adams v. State, 749
S.W.2d 635, 639 (Tex. App.-Houston [1st Dist.] 1988, pet. ref'd). Thus, the focus of our
inquiry is whether the trial court took adequate steps to ensure that Linton had a minimum
understanding of the proceedings. 

2. Analysis 

 As noted above, a trial court has an obligation outside of article 38.31 of the Texas
Code of Criminal Procedure to fashion a remedy suitable to overcome a particular
defendant's disability. (6) See Lincoln, 999 S.W.2d at 809. In most instances, a suitable
remedy will be readily apparent from the nature of the disability itself. For example, in
Adams, the court found that the appointment of a stenographer for a deaf defendant who
neither understood sign language nor read lips, but who had a high proficiency in the
English language, would ensure adequate understanding. Adams, 749 S.W. at 639. In
other instances, the remedy will not be as apparent. Under certain circumstances it will be
necessary for a trial court to inquire further in order to expose the true nature of the
disability. Linton, for example, is hearing impaired. Her disability, however, is much more
complex. (7) 

 Linton is "pre-lingually deaf;" she became deaf at sixteen months old, well before
she could develop comprehension of the English language. She reads at a fourth-grade
level and is unable to communicate by voice. Linton also does not fully understand
American Sign Language. Thus, as the record indicates, her form of communication lies
somewhere between coded English and ASL. Once the disability is fully exposed, as it
was in this case, the responsibility falls to the trial court to take whatever steps are
necessary to insure minimum understanding. 

 It was first brought to the court's attention by the interpreters that Linton was having
difficulty communicating. Rather than try to communicate through standard sign language,
the court interpreter chose to transliterate the proceedings. (8) According to Andrews, Linton
was provided with a very "English based" interpretation. Given Linton's low level of English
comprehension, it is difficult to ascertain, based on the transliteration alone, whether Linton
understood what was occurring in the courtroom. To remedy this possibility, the trial court
chose to appoint an additional interpreter to sit at the defense table, so that difficult
concepts could be broken down to a level that she could understand. The trial court
insisted, however, that this occur during breaks in the trial. The State asserts that this
accommodation was sufficient to provide Linton with the minimum understanding
necessary. We disagree.

 The Constitution requires that a defendant sufficiently understand the proceedings
against him to be able to assist in his own defense. Lincoln, 999 S.W.2d at 809. Surely,
the Constitution contemplates more than just a post hoc understanding of trial proceedings. 
A defendant's inability to simultaneously understand testimony being given would
undoubtedly limit an attorney's effectiveness, especially on cross-examination. To be sure,
being able to observe but not comprehend the very process that has placed a criminal
defendant's freedom in jeopardy is quite troubling. Thus, for this Court, in dealing with a
deaf defendant, the true measurement of "understanding" must occur at the time live
testimony is given. 

 In the case at bar, the trial court had notice of Linton's low level of English
comprehension and her inability to thoroughly understand ASL. (9) Rather than address
Linton's inability to understand the immediate flow of information, the trial court merely
appointed a second standard interpreter to assist Linton during breaks. Nothing in the
record indicates how this second interpreter "broke down" difficult concepts for Linton, nor
does the record indicate that the second interpreter was successful in her attempt. On the
contrary, Andrews testified that based on her (1) pre/post-trial evaluation of Linton, (2)
observation of the trial proceedings, and (3) the type of transliteration utilized by the court
appointed interpreters, she was of the opinion that Linton did not understand what was
occurring in the courtroom. We agree. 

 Based on the record as provided, and under the circumstances of this case only,
we find that the appointment of an additional interpreter to break down concepts during
breaks in trial was insufficient to provide Linton with a thorough understanding of the
proceedings against her. Moreover, given that the English based transliteration did not
account for Linton's low level comprehension of the English language, we find that the
transliteration provided was also inadequate. As one commentator has noted: 

 Meaningful communication, with or without an interpreter, requires language
and background information with which to share meaning. The deaf person
with minimal language skills lacks both. Even if the interpreter can find a set
of basic signs that the deaf person understands, the deaf person with
minimal language skills may still not understand their meaning in the context
of the discussion. 


Michele LaVigne & McCay Vernon, An Interpreter Isn't Enough: Deafness, Language, and
Due Process, 2003 Wisc. L. Rev. 843, 870-71 (2003). 

 The trial court was provided a viable option in order to secure Linton's
understanding of the trial proceedings. Andrews testified that the use of a deaf-relay
interpreter would provide adequate understanding. Given the complexity of Linton's
hearing impairment, we believe that the trial court erred in not providing Linton with the
assistance of a deaf-relay interpreter. We sustain appellant's third issue. (10) 

III. Conclusion

 We reverse the trial court's judgment and remand for a new trial. 


 

 ROGELIO VALDEZ

 Chief Justice

 

Publish. 

Tex. R. App. P. 47.2(b).

 

Opinion delivered and filed 

this the 16th day of August, 2007.


 
1. Audrey also asserts (1) an ineffective assistance of counsel argument, and (2) that the trial court
erred in denying an evidentiary hearing on her amended motion to suppress. 
2. A motion to substitute counsel was filed on November 23, 2004. 
3. The record of this hearing indicates that Linton's testimony was brief and that most of her responses
to questions posed were inaudible. 
4. Specifically, Mr. Trevino made the following observation: 


 What I'm trying to get clarification, first of all, in our business, there are two ways of rendering
the message. One is called transliteration. One is called interpreting. I have to then go on
the record and say that this is transliteration than interpreting. And that what they will be
videoing will be the approximation of English on the lips and English and ASL vocabulary,
hopefully, at the same time and meaningful. It is not a perfect transliteration. It is not a
perfect translation. Okay. And the nature of the beast of transliteration is never going to be
as good as interpreting between two languages. So long as that is understood. 
5. The record indicates that Dr. Jean Andrews is the Director of Graduate Programs in Deaf Education
at Lamar University in Beaumont, Texas. She holds a Ph.D. in speech and hearing sciences from the
University of Illinois and a minor in linguistics and literacy. She testified that she has extensive experience
in conducting communication assessments on ASL, lip reading, speech, reading, and writing skills of different
deaf adults. 
6. The Attorney General of Texas has opined that article 38.31 obligates a trial court 


 to explore alternative methods of communication that are appropriate for each person . . .
Such alternative methods may, for instance, include the use of sign language, finger spelling,
lip reading, written communication, or stenographers to provide simultaneous transcriptions,
or a combination of these methods, depending a person's proficiency in the different systems
of communication. 


Op. Tex. Att'y. Gen. No. JM-113 (1983). 
7. Indeed, we distinguish this case from other appellate court decisions that have dealt with the issue
of a deaf defendant. Each appellate court that has addressed the issue has done so in the context of a deaf
defendant who has no knowledge of sign language but has the ability to thoroughly read or speak English. 
See Salazar v. State, 93 S.W.3d 339, 341 (Tex. App.-Texarkana 2002, pet.ref'd untimely filed) (defendant
was born without one eardrum and was partially deaf in other ear but was otherwise able to address and
respond to the trial court or counsel "indicating that he heard and understood what was said."); Lincoln v.
State, 999 S.W.2d 806, 809 (Tex. App.-Austin 1999, no pet.) (defendant who suffered from a ringing in the
ear that "comes and goes" was not considered deaf and otherwise able to address and respond
appropriately); Brazell v. State, 828 S.W.2d 580, 581 (Tex. App.-Austin 1992, pet. ref'd) (deaf defendant did
not understand sign language and was unable to read lips but was otherwise able to read the simultaneous
translation of the reporter's shorthand); Adams v. State, 749 S.W.2d 635, 636 (Tex. App-Houston [1st Dist.]
1988, pet. ref'd) (deaf defendant was unable to understand sign language but was otherwise able to speak
and read English "very well."). In each case, there was no issue raised as to the defendant's ability to either
comprehend, or communicate through, the English language. 
8. On defining transliteration, one commentator has made the following observation: 


 The role of the interpreter for the deaf is probably easiest to understand if we begin at the
English end of the spectrum. The most English form of interpretation is known as
transliteration. Transliteration is the means by which spoken English is converted word for
word into visual English. 

 

 Transliteration conveys the words being spoken. It does not decode the spoken English -
that is, it does not get to the meaning. Rather, it recodes the English, making the spoken
word visible, either in signed form or orally. Oral transliteration is a type of interpretation in
which the interpreter repeats the words of the speaker verbatim. Signed transliteration
utilizes manually coded English and reproduces the words via hand signs and finger-spelling. 



Michele LaVigne & McCay Vernon, An Interpreter Isn't Enough: Deafness, Language, and Due Process, 2003
Wisc. L. Rev. 843, 870-71 (2003). 
9. On this point, its been noted that:


 Deaf and hard-of-hearing people are hit particularly hard by the vocabulary of English. The
English vocabulary of an average deaf fifteen-year-old is nowhere near that of a hearing nine-year-old and, unlike the vocabulary of the nine-year-old, will probably not improve
significantly. Simply put, many deaf people do not understand the words we are using, even
if the words are put into a visible form by writing of finger-spelling. In fact, many relatively
educated deaf people will not recognize English words that are known by uneducated,
functionally illiterate hearing people. In a word-based adversarial arena like the courtroom,
the inability to cope with the vocabulary can be disastrous if the appropriate accommodations
are not made.


id. at 856.
10. Our disposition of this issue relieves us from having to address Linton's remaining issues. See
Tex. R. App. P. 47.1.